# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
## FOURTH DIVISION

Stephen H. Christensen, D.D.S.

    Plaintiff,

v.

Metropolitan Life Insurance Company
(TNE/MET), Successor in Interest by
Merger to New England Mutual
Life Insurance Company,

    Defendant.

Court File No. _06-4319 JNE/JJG_

**COMPLAINT**

**JURY TRIAL DEMANDED**

For his Complaint against Defendant, Metropolitan Life Insurance Company (TNE/MET), successor in interest by merger to New England Mutual Life Insurance Company ("MLIC" herein), Plaintiff Stephen H. Christensen, D.D.S. ("Dr. Christensen") states and alleges as follows:

## I.   INTRODUCTION

1. Defendant contracted with Dr. Christensen to provide lifetime disability income of $5,000.00 per month in the event Dr. Christensen became totally disabled. Because of a disability related to the removal of a brain tumor, Dr. Christensen began receiving disability benefits in June 2002. On several occasions, Dr. Christensen contacted MLIC's official

SCANNED

OCT 2 7 2006

U.S. DISTRICT COURT MPLS

representatives and inquired whether he would be entitled to receive disability benefits after age 65, as indicated in his Policy. In response to these inquiries, Defendant's representatives promised Dr. Christensen that he would continue receiving his $5,000.00 per month disability benefit after age 65. Dr. Christensen relied on these promises and statements – however, now that he has turned 65, Defendant has unreasonably and inexcusably reversed its position. Contrary to the plain terms of Dr. Christensen's disability insurance policy, and in clear violation of promises previously made, Defendant has informed Dr. Christensen that he is not entitled to lifetime disability benefits.

2. Because Defendant's current position is in clear violation of the terms of the agreements between the parties, and because Defendant knew Dr. Christensen was relying on its statements and promises to his detriment, Dr. Christensen now brings claims for breach of contract, misrepresentation, estoppel, and violations of Minnesota Consumer Protection statutes in order to obtain the lifetime disability benefits to which he is entitled.

## II.    JURISDICTION AND VENUE

3. Jurisdiction is appropriate under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and the action is between citizens of different states.

4. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## III.  PARTIES

5. Stephen H. Christensen, D.D.S. is an individual who has a residence in Hennepin County and who practiced dentistry in Hennepin County for approximately 36 years.

6. Defendant Metropolitan Life Insurance Company ("MLIC"), successor in interest by merger to New England Life Insurance Company, is a New York corporation and, upon information and belief, has its principal place of business at 1 Madison Avenue, New York, New York 10010.

## IV.  FACTUAL BACKGROUND

### A.  Dr. Christensen Is Unable to Practice Dentistry Because of a Large, Slow-Growing Brain Tumor.

7. Dr. Christensen began practicing dentistry in 1966. Over time, he built a successful dental practice, primarily in prosthodontics (complex restorative dentistry). He was a respected dentist and community member with many loyal patients.

8. In approximately 1996-1997, close family members, co-workers and friends began noticing behavioral changes in Dr. Christensen. At work, Dr. Christensen began exhibiting a high degree of irritability with both

patients and staff. At home, he began exhibiting many behaviors that were very unusual, including, but not limited to, loss of memory, becoming easily frustrated, overreaction to minor irritations and inappropriate anger.

9. At the time these behaviors began to appear, family, friends, colleagues and co-workers believed that the behaviors were odd and not consistent with Dr. Christensen's usual personality traits. Because the behaviors were embarrassing, however, details about their nature and scope were not widely shared or discussed with others.

10. During this same time period, Dr. Christensen began experiencing headaches and blurred vision. The vision issues predominately affected his right eye. The headaches were most severe in the right templar area. Because he is very pain tolerant and was committed to his work, Dr. Christensen did not attribute the symptoms he was suffering to any physiological problems or abnormalities that he may have been facing at the time. Rather, he tried to ignore the headaches, focus his vision, and work through the pain.

11. Even though neither Dr. Christensen, nor his family, friends, colleagues and co-workers realized it at the time, the physical symptoms and behavioral changes that he was experiencing were related to a large, benign tumor that was slowly growing under the frontal lobes of his brain.

12. Dr. Christensen's headaches became intractable over time. His vision loss was progressive and behavioral abnormalities became more pronounced. Throughout the summer and fall of 2001, Dr. Christensen attempted to ignore the symptoms associated with the growing tumor, and tried to work through the physical difficulties he was experiencing. He attempted to treat the headaches by using over-the-counter pain relievers. He tried to address the vision problems by changing his eyeglass prescription. In many ways, Dr. Christensen was unaware of the behavioral changes he was experiencing.

13. In October of 2001, Dr. Christensen's three dental staff members threatened to terminate their employment if his behavior did not change. They each wrote him a note stating that he had become almost impossible to work with. Thinking that he could change his behavior, Dr. Christensen sat down with each staff person and promised to be a better boss. The three staff members decided to remain employees, primarily out of loyalty to Dr. Christensen for whom they had worked for many years. Later, after the diagnosis and surgical removal of the tumor, patients and staff stated they had seen Dr. Christensen in his clinic holding his head from the headache pain. Dr. Christensen has no memory of these episodes.

14. Eventually Dr. Christensen found it necessary to seek medical treatment for the many symptoms he was experiencing.  By March 2002 symptoms had exacerbated to the point that Dr. Christensen's wife, Cathy, was becoming very concerned for his health.

15. On Friday evening of May 31, 2002 Dr. Christensen experienced a severe headache that lasted all night and into the following afternoon. Dr. Christensen's wife was so concerned by this time that she called one of Dr. Christensen's brothers who is a surgeon. She related the ongoing and aforementioned symptoms and especially the then current twenty-four hour, severe headache. They decided that Dr. Christensen should see a neurologist.

16. Dr. Christensen's brother referred him to Dr. Erik Schenk, a neurologist at Meadowbrook Medical Center. On Wednesday June 5, 2002 Dr. Christensen and his wife saw Dr. Schenk who ordered an MRI of Dr. Christensen's cranium. The MRI was taken later that evening. The following morning Dr. Schenk called Dr. Christensen at his office and informed him that he had a large (golf ball-sized) tumor in his cranium under the right frontal lobe of his brain.  Dr. Schenk stated he believed the tumor was a benign meningioma that would need to be removed as soon as possible.

17. Some time thereafter, Dr. Christensen was referred by a neurosurgical specialist (Dr. Rick Nissen) to Dr. Mahmoud Nagib, who is a

neurosurgeon at Abbott Northwestern Hospital. Dr. Nagib met with Dr. Christensen on Monday, June 10, 2002. Dr. Nagib diagnosed Dr. Christensen's medical condition as a large, anterior cranial fossa meningioma – a primary brain tumor. After meeting with Dr. Christensen and learning of the extent of his symptoms related to the tumor, Dr. Nagib scheduled surgery immediately for Dr. Christensen.

18.Dr. Nagib expressed concern that, because the tumor was so large and so highly vascularized (the main artery to the tumor was branched off of the Optic artery to his right eye), the vessel could rupture causing hemorrhaging and many attendant problems for Dr. Christensen. Dr. Nagib ordered an embolization done for June 13, the day prior to the main surgery.

19.On June 14, 2002, Dr. Nagib performed surgery to remove the tumor. Because the tumor was so large and the surgery so invasive, the result of the surgery and the tumor had immediate impact on Dr. Christensen's ability to continue performing dentistry.

20.Following the surgery, it took several months for Dr. Christensen to recover. Dr. Christensen was told that the tumor had been developing for as long as fifteen years and that the healing could take many years as well. During the first eight to ten months of healing, Dr. Christensen's memory was very foggy and he exhibited fatigue, lack of energy, inability to focus on

details and other symptoms that would be expected for someone who had experienced invasive brain surgery.

21.Based on the extent of the surgery and the degree to which the tumor affected Dr. Christensen's critical thinking, motor skills, memory and other brain functions, Dr. Nagib determined that Dr. Christensen would no longer be able to practice dentistry. This determination caused Dr. Christensen to seek benefits under a disability income policy he had purchased from New England Mutual Life Insurance Company many years earlier. He also made arrangements to sell his dental practice.

### B. Dr. Christensen's Disability Income Policy.

22.In September 1988, Dr. Christensen applied for Disability Income Insurance through the New England Mutual Life Insurance Company. At the time he applied for the policy, Dr. Christensen was told by representatives of the New England Life Insurance Company that he would be entitled to lifetime benefits in the event of a disability.

23.A Disability Income Policy (the "Policy") was issued to Dr. Christensen on November 10, 1988. The face-page of the Policy that was issued to Dr. Christensen in November 1988 reads, in part, as follows:

New England Mutual Life Insurance Company agrees to pay the Owner of the Policy monthly income benefits for total disability of the Insured which starts while this Policy is in force and for the related residual disability; and to provide the other rights and benefits of the Policy.

These agreements are subject to all of the provisions of the policy.

Disability Income Policy

- The policy provides monthly income benefits for a total disability of the insured.
- The policy provides monthly income benefits for residual disability of the insured.
- The policy participates in dividends.

24. Section 1 of the Policy contains the Policy Schedule, including the Schedule of Benefits. Under the Schedule of Benefits, the Policy reads as follows:

| | | |
|---|---|---|
| Disability Income (DI) | Maximum Monthly Benefit: | $5,000.00 |
| Lifetime Disability Income After Age 65 (LDI) | Monthly Income: | $5,000.00 |
| Proportionate Disability Income (PDI) | See Rider | |

25. Paragraph 2 of the Policy states as follows:

The Contract

This Policy is a legal contract between the Owner of the Policy (called "You") and New England Mutual Life Insurance Company (called "the Company"). The Policy, which includes the attached Application, is the entire contract between you and the Company.   All Riders are listed in Section 1. No change in or waiver of the provisions of the Policy is valid unless the change or waiver is signed by the President or the Secretary of the Company.

26. "Total Disability" is defined under the Policy as follows:

"Total Disability" means a disability of the insured:

- which results from sickness or accidental bodily injury of the insured; and
- which prevents the insured from engaging in the regular occupation of the insured; even if the insured is engaged in a different occupation.

The regular occupation means the regular occupation of the Insured when Total Disability starts.   Total Disability may be the result of a sickness which began or an injury which occurred either before or after the Policy was issued; but the sickness or injury must be under treatment by or at the direction of a person, other than you or the Insured, who is licensed to treat the sickness or injury.

**C.    Defendant Determines that Dr. Christensen Is Disabled and Entitled to Lifetime Disability Income Benefits After Age 65.**

27.Defendant determined that Dr. Christensen was totally disabled under the terms of the Policy and was entitled to receive Disability Income Benefits of $5,000.00 per month commencing in June 2002.

28.In July 2002, Dr. Christensen communicated with Janice King, one of Defendant's customer care specialists. He also communicated with Greg Davis, his local insurance agent. The purpose of these communications during this time-period was to (1) confirm Dr. Christensen's eligibility to receive Disability Income Benefits, and (2) seek payment due and owing under Dr. Christensen's separate Business Overhead Expense ("BOE") Policy that he also had through New England Mutual Life Insurance Company.

29.During this time period, Dr. Christensen did not seek clarification from Defendant concerning his eligibility to receive lifetime disability benefits. He had always understood that he would receive benefits for his lifetime in the event he became disabled. The main focus was to have Dr. Christensen begin receiving benefits so he could pay his bills.

30.By the first quarter of 2003, issues related to Dr. Christensen's BOE Policy were resolved to the mutual satisfaction of the parties and Dr.

Christensen continued to receive his $5,000.00 per month Disability Income Benefit.

31.During the summer and early fall of 2003, Dr. Christensen took steps to make concrete plans for his financial future. Because he had been told at the time he applied for his Policy that he would be entitled to lifetime benefits, and because he was receiving Disability Income Benefits in the amount of $5,000.00 per month, Dr. Christensen wanted to confirm he would be entitled to lifetime benefits.

32.Dr. Christensen phoned, on or about August 10, 2003, Janice King, one of Defendant's Customer Care Specialists with whom he had been working, to request verification that he would receive lifetime disability benefits on account of his disability.

33.In a letter dated August 11, 2003, Ms. King responded to Dr. Christensen and indicated that, pursuant to Policy #18-0D139393-001 (the Disability Policy referenced herein), disability benefits would continue for Dr. Christensen's lifetime.

34.The day that Dr. Christensen received this confirmation letter from Ms. King (on or about August 12, 2003), he contacted his New England Mutual Life Insurance Company Agent, Greg Davis, and asked Mr. Davis to verify that he would receive lifetime disability benefits. The assistant to Mr.

Davis, Mary Capra, contacted Jane Hunt, another of Defendant's Customer Services Representatives.   During the telephone conversation between Ms. Capra and Ms. Hunt, which occurred on or about August 13, 2003, Ms. Hunt verified to Ms. Capra that Dr. Christensen would be entitled to LDI Benefits after age 65.   Ms. Capra noted this confirmation on a copy of Ms. King's August 11, 2003 letter and sent it to Dr. Christensen.

35.Dr. Christensen was pleased to receive confirmation that he was entitled received lifetime benefits under his Policy. Based on the information he received from Defendant's representatives, he fully expected to continue receiving his monthly $5,000.00 lifetime disability  benefit as promised by Defendant's official representatives.        Dr. Christensen refinanced his mortgage and determined he did not need to alter  his spending habits, given the assurances he received about receiving lifetime disability benefits.

**D.     Defendant Wrongly Reverses Its Position and Informs Dr. Christensen It Will Not Provide LDI Benefits After Age 65.**

36.On or about April 24, 2006, a representative of Defendant's Benefits Center wrote Dr. Christensen and advised him that the maximum period of benefits for his Disability Income Benefit would expire on the Policy Anniversary date following his 65th Birthday – i.e., November 10, 2006. Because he believed he was entitled to lifetime disability benefits

under the terms of his Policy, because his right to receive lifetime disability benefits had been confirmed and promised by Defendant, and, because he relied on these representations to do his financial planning, Dr. Christensen was shocked and stunned to learn that MLIC changed its position. Because the April 24, 2006 correspondence completely contradicted Dr. Christensen's understanding of his Policy, as well as the prior representations made by Defendant's agents, Dr. Christensen again contacted his agent, Greg Davis, to verify his eligibility for lifetime disability benefits.

37.On or about May 3, 2006, Mr. Davis contacted Janice King concerning Dr. Christensen's lifetime disability benefits. . Ms. King once again confirmed, this time to Mr. Davis, that lifetime disability benefits for Dr. Christensen pursuant to his Policy would last beyond age 65. In turn, Mr. Davis relayed this confirmation to Dr. Christensen.

38.Despite the May 3 confirmation concerning lifetime benefits, Defendant, on or about May 26, 2006, through a Disability Benefits Representative named Anila Skende, sent a letter to Dr. Christensen outlining the company's position that Defendant would not provide Dr. Christensen lifetime disability benefits. After receiving repeated confirmation from Defendant that his understanding of his Policy was

14

accurate, and that he should receive lifetime disability benefits, Dr. Christensen was extremely dismayed to learn that Defendant intended to refuse to provide lifetime benefits.

39.Dr. Christensen was particularly frustrated and disappointed with the May 26, 2006 correspondence because Defendant's stated position completely reversed prior promises and representations made by official company representatives. Dr. Christensen had clearly informed his insurance agent and Ms. King that he was relying on receiving lifetime disability benefits.  He and his wife made important financial decisions based on the expectation, as promised by Defendants, that he would receive a lifetime disability benefit of $5,000.00 per month.

40.As an example, Dr. Christensen refinanced his home after August 2003, but would have decided to downsize if he had known disability benefits  would cease at age 65.  Similarly, Dr. Christensen and his wife would have saved more and spent less from August 2003 to the present if they had been informed disability benefits  would not be available after November 2006.

41.Because he believed MLIC was wrong to deny his lifetime benefits,  and because it appeared Defendant's representatives either carelessly made promises, or never intended to honor the promises made

concerning lifetime benefits, Dr. Christensen retained legal counsel to challenge the May 26 denial of benefits.

42.Dr. Christensen, through his counsel, in letters dated July 17, 2006 and August 23, 2006, outlined for Defendants why he is entitled to receive lifetime disability benefits. The letters also demanded that Defendant agree to pay lifetime disability benefits to Dr. Christensen.

43.During this time-period, Dr. Christensen was interested to learn, through his counsel, that Defendant apparently has a documented and well-publicized history of bad-faith claims-handling conduct in multiple cases across the nation. Indeed, one Federal District Court has described Defendant's conduct in this regard as "revealing a disturbing pattern of erroneous and arbitrary benefit denials, bad faith misinterpretations and other unscrupulous tactics." *See Bradford Trust v. First Unum Life Insurance Company of America*, 321 F.Supp.2d 226, 247-48 n. 20 (D. Mass. 2004).

44.In response to the demand letters, Alisa Morgan, an Appeals Consultant for Defendant wrote a letter to Dr. Christensen's counsel dated September 7, 2006, indicating that Defendant would not reverse the May 26 decision – i.e., Defendants stood by their decision to deny Dr. Christensen lifetime disability benefits.

45. As part of its rationale for denying benefits, Defendants ignored the plain terms contained in the Schedule of Benefits that indicate Dr. Christensen is entitled to Lifetime Disability Benefits After Age 65 in an amount of $5,000.00 per month.

46. Defendant also ignored Section 2 of the Policy that states any Riders to the Policy must be indicated on the Schedule of Benefits. Moreover, Section 2 of the Policy requires that changes to the Policy be signed by the President or Secretary of the Company. Despite the fact there is no Rider referenced in Section 1 of the Policy, and there were no changes to the Policy authorized by the President or Secretary of the Company, Defendant claimed that the purported Rider to Policy is binding and that Dr. Christensen is not entitled to lifetime disability benefits under the terms of the Rider.

47. Because Dr. Christensen's Policy clearly indicates he is entitled to lifetime disability benefits, because Defendant is refusing to provide such benefits, because Defendant has made promises to him that it now does not want to honor, and because, in the event the Rider is binding, he is entitled to benefits under the terms of the Rider, Dr. Christensen has no choice but to seek the Court's assistance to compel Defendant to make lifetime disability payments to him as required under the terms of the Policy.

## CAUSES OF ACTION

## COUNT I

### DECLARATORY JUDGMENT –
### BREACH OF THE INSURANCE CONTRACT
### AND BREACH OF THE COVENANT OF
### GOOD FAITH AND FAIR DEALING

48.Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

49.Dr. Christensen and Defendant had an agreement, the express and implied terms of which, construed consistently with the covenant of good faith and fair dealing (which is a part of every contract by law) obligated Defendant to:

     a.     Provide disability income of $5,000.00 per month to Dr. Christensen;

     b.     Provide Lifetime Disability Benefits ("LDI Benefits") to Dr. Christensen after age 65 in the amount of $5,000.00 per month;

     c.     Not attempt to enforce any Rider to the agreement unless the Rider was listed in Section 1 of the Policy which contains the Schedule of Benefits;

     d.     Not change or alter the written terms of the policy without written approval and notice by the President or Secretary of the company; and

     e.     To deal honestly and fairly with Dr. Christensen.

50.Defendant breached its agreements with Dr. Christensen by its unreasonable conduct, as described above, including, but not limited to, the following:

a.  Denying its obligation to provide LDI Benefits to Dr. Christensen in the amount of $5,000.00 per month after age 65;

b.  Informing Dr. Christensen at the time he purchased he Policy that he would be entitled to lifetime disability benefits, repeatedly verifying that he was eligible for such benefits and then, shortly before he turned 65, changing its position and informing him that he is not entitled to lifetime benefits;

c.  Attempting to enforce the terms of a purported Rider to the policy which Rider is not referenced in Section 1 which contains the Schedule of Benefits of the Policy;

d.  Attempting to change or alter the written terms of the Policy;

     i.  Claiming that Dr. Christensen is not entitled to LDI Benefits after age 65, contrary to the terms of the Policy; and

    ii.  Claiming that a Rider not referenced in Section 1 is binding.

d.  Not dealing honestly or fairly with Dr. Christensen by repeatedly indicating through official representatives that he was eligible to receive LDI Benefits after age 65 and then changing its position by claiming these statements were made in error without further explanation.

51.As a direct and proximate result of Defendant's breaches of its agreements, Dr. Christensen has suffered damages in an amount yet to be determine and that will be fully established at the trial on the merits, and which are reasonably believed to be in excess of $75,000.00.

## COUNT II

## EQUITABLE AND PROMISSORY ESTOPPEL

52. Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

53. In its communications with Dr. Christensen, Defendant had a legal obligation to be aware that Dr. Christensen could and would rely upon certain representations and promises Defendant made to him, especially statements or promises upon which he could and would rely to his detriment.

54. On several occasions, Defendant through its official representatives and agents, made statements, promises, and representations to Dr. Christensen concerning his eligibility to receive LDI Benefits after age 65. The circumstances surrounding those statements, representations and promises indicate that Defendant was aware that Dr. Christensen would rely upon the statements. Those facts and circumstances include the following:

- In response to a phone call from Dr. Christensen where he requested confirmation about his eligibility to receive LDI Benefits, Janice King stated in a letter dated August 11, 2003 and addressed to Dr. Christensen that his benefits under Policy No. 18-0D139393-001 would continue for his lifetime;
- On or about August 13, 2003, in response to a request From Dr. Christensen to confirm his eligibility for LDI Benefits, Jane Hunt, a financial customer services

representative for Defendant stated to Mary Capra, an administrative assistant for Greg Davis, Dr. Christensen's insurance agent, that Defendant would provide LDI Benefits to Dr. Christensen for life – i.e., after age 65; In response to another request by Dr. Christensen to confirm his eligibility for LDI Benefits, on or about May 3, 2006, Greg Davis contacted Janice King on behalf of Dr. Christensen and substantiated that Dr. Christensen would receive LDI Benefits for his lifetime; and

- Informing Dr. Christensen at the time he purchased he Policy that he would be entitled to lifetime disability benefits, repeatedly verifying that he was eligible for such benefits and then, shortly before he turned 65, changing its position and informing him that he is not entitled to lifetime benefits.

55. Dr. Christensen relied upon the promises made by Defendant to his detriment.     Because Dr. Christensen relied on these statements, representations and promises to his detriment, Defendant is and shall be estopped from stating these promises were made in error.

56. In the event that Dr. Christensen is not allowed to receive LDI Benefits after age 65, he is entitled to the damages that he suffered as a direct and proximate result of the promises made by Defendant and upon which he relied to his detriment. The extent of Dr. Christensen's damages Dr. Christensen suffered as a result of relying on Defendant's promises to his detriment is not presently known, but will be determined at the trial on the merits and is reasonably believed to be in excess of $75,000.00.

## COUNT III

## VIOLATION OF THE PREVENTION OF CONSUMER FRAUD ACT MINN. STAT. § 325F.68 *ET SEQ.*

57.Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

58.Minnesota Statute Section 325F.69, provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not that person has in fact been misled, deceived, or damaged thereby is enjoinable as provided herein.

59.Pursuant to Minnesota Statute Section 8.31, subdivision 3(a), any person injured by a violation of Minnesota Statute Section 325F.69 "may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

60.Defendant violated the provisions of Minnesota Statutes Section 325F.69 and 8.31, subdivision 3(a) by its unreasonable conduct as indicated and noted above, including, but not limited to, the following:

- In response to a phone call from Dr. Christensen where he inquired about his eligibility for LDI Benefits, Janice

King stated in a letter dated August 11, 2003 and addressed to Dr. Christensen that his benefits under Policy No. 18-0D139393-001 would continue for his lifetime;

- On or about August 13, 2003, in response to a request From Dr. Christensen to confirm his eligibility for LDI Benefits, Jane Hunt, a financial customer services representative for Defendant stated to Mary Capra, an administrative assistant for Greg Davis, Dr. Christensen's insurance agent, that Defendant would provide LDI Benefits to Dr. Christensen for life – i.e., after age 65; and

- In response to another request by Dr. Christensen to confirm his eligibility for LDI Benefits, on or about May 3, 2006, Greg Davis contacted Janice King on behalf of Dr. Christensen and substantiated that Dr. Christensen would receive LDI Benefits for his lifetime.

- Defendant, in a letter dated September 7, 2006, informed Dr. Christensen that the representations concerning his eligibility to receive LDI Benefits after age 65 noted above were made in error and that he is not entitled to such benefits.

- At the time he purchased the Policy, Defendant informed him that he would be entitled to lifetime disability benefits and after he was disabled, repeatedly confirmed he would be entitled to such benefits – now, at the time he turns 65, Defendant has unreasonably and fraudulently changed its position and has informed Dr. Christensen that he is not entitled to lifetime benefits.

61. As a direct and proximate result of Defendant's actions, Dr. Christensen has been damaged in an amount to be determined at the trial on the merits, but which is reasonably expected to be in excess of $75,000.00. Additionally, Dr. Christensen is entitled to costs and disbursements, including costs of investigation and reasonable attorney's fees on account of

Defendant's violation of the Minnesota Consumer Protection Act (Minn. Stat. §325F.69) and the Private Attorney General Statute (Minn. Stat. § 8.31, subd. 3(a)).

## COUNT IV

## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT MINN. STAT. § 325.43 *ET SEQ.*

62.Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

63.Under Minnesota Statute Section 325D.44, a person engages in a deceptive trade practice when in the course of business, the person engages in conduct which creates a likelihood of confusion or misunderstanding. *See* Minn. Stat. § 325D.44, subd. 1(13).

64.A person damaged by deceptive trade practices may enjoin the conduct of the offending party. *See* Minn. Stat. § 325D.45. A party that successfully pursues a suit for deceptive trade practices is entitled to costs, including attorney's fees. *See id.*

65.By its unreasonable conduct as outlined above, Defendant has engaged in deceptive trade practices, including, but not limited to, the following:

- In response to a phone call from Dr. Christensen where he inquired about his eligibility for LDI Benefits, Janice

King stated in a letter dated August 11, 2003 and addressed to Dr. Christensen that his benefits under Policy No. 18-0D139393-001 would continue for his lifetime;

- On or about August 13, 2003, in response to a request From Dr. Christensen to confirm his eligibility for LDI Benefits, Jane Hunt, a financial customer services representative for Defendant stated to Mary Capra, an administrative assistant for Greg Davis, Dr. Christensen's insurance agent, that Defendant would provide LDI Benefits to Dr. Christensen for life – i.e., after age 65; and

- In response to another request by Dr. Christensen to confirm his eligibility for LDI Benefits, on or about May 3, 2006, Greg Davis contacted Janice King on behalf of Dr. Christensen and substantiated that Dr. Christensen would receive LDI Benefits for his lifetime.

- Defendant, in a letter dated September 7, 2006, informed Dr. Christensen that the representations noted above concerning his eligibility to receive LDI Benefits after age 65 were made in error and that he is not entitle to such benefits.

- At the time he purchased he Policy, Defendant informed him that he would be entitled to lifetime disability benefits and after he was disabled, repeatedly confirmed he would be entitled to such benefits – now, at the time he turns 65, Defendant has unreasonably and fraudulently changed its position and has informed Dr. Christensen that he is not entitled to lifetime benefits.

66. As a result of Defendants' deceptive trade practices, Dr. Christensen is entitled to injunctive relief preventing Defendant from maintaining its position that it is not responsible for paying Dr. Christensen LDI Benefits in the amount of $5,000.00 per month after age 65. Dr. Christensen is also entitled to costs, including reasonable attorney's fees, for

Defendant's violation of the Deceptive Trade Practices Act (Minn. Stat. § 325.D.44-45).

## COUNT V

### DECLARATORY JUDGMENT – BREACH OF THE RIDER TO THE INSURANCE CONTRACT ALTERNATIVE THEORY OF RECOVERY

67. Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

68. In the event the Court finds the Rider to the Policy binding, Dr. Christensen and Defendant had agreements under the terms of the Rider, the express and implied terms of which, construed consistently with the covenant of good faith and fair dealing (which is a part of every agreement by law) obligated Defendant to pay monthly, lifetime disability benefits to Dr. Christensen for a Total Disability which continues beyond the end of the maximum period for benefits:

- Which results from an accidental bodily injury and which started before the Policy anniversary date on or next following the 65th birthday of the insured; or
- Which results from a sickness and which started before the Policy anniversary on or next following the 60th birthday of the insured.

69. Defendant breached its obligations to and agreements with Dr. Christensen by its unreasonable conduct, described above, including but not limited to, the following:

    a.    Denying that Dr. Christensen is entitled to LDI Benefits after age 65 under the terms of the rider;

    b.    Denying that Dr. Christensen met the definition of sickness under the terms of the rider prior to the Policy anniversary date following his 60th birthday – i.e. prior to November 10, 2001.

70. As a direct and proximate result of Defendant's breaches of its agreements, Dr. Christensen has suffered damages in an amount yet to be determine and that will be fully established at the trial on the merits, and which is reasonably believed to be in excess of $75,000.00.

71. Pursuant to Minnesota Statute Sections 555.01 and 555.02, a party may request a court to interpret and determine the construction of a contract. Accordingly, in the event the Court finds the Rider binding, Dr. Christensen requests that the Court construe and interpret the terms of the Rider. He also is entitled to a declaration of this Court directing Defendant to pay him LDI Benefits after age 65 in the amount of $5,000.00 per month.

## COUNT VI

## RECKLESS REPRESENTATION

72. Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

73. Defendant had a legal responsibility to ensure, when speaking positively and without qualification about facts which would induce Dr. Christensen to act in reliance on the communications, that the communications were accurate and true. Defendant had a further legal obligation to ensure that, in representations upon which it knew Dr. Christensen would rely, its representatives would not consciously ignore the truth of the representations and to be aware that the information shared with Dr. Christensen was adequate and dependable enough to support a position or unqualified assertion.

74. Defendant violated its obligations to Dr. Christensen and made reckless representations by its unreasonable conduct as indicated above, which includes, but is not limited to, making the following unqualified statements, promises and assertions:

- In response to a phone call from Dr. Christensen where he inquired about his eligibility to receive LDI Benefits, Defendant's representative Janice King stated in a letter dated August 11, 2003 and addressed to Dr. Christensen that his benefits under Policy No. 18-0D139393-001 would continue for his lifetime;

- On or about August 13, 2003, in response to a request From Dr. Christensen to confirm his eligibility for LDI Benefits, Jane Hunt, a financial customer services representative for Defendant stated to Mary Capra, an administrative assistant for Greg Davis, Dr. Christensen's insurance agent, that Defendant would provide LDI Benefits to Dr. Christensen for life – i.e., after age 65; and

- In response to another request by Dr. Christensen to confirm his eligibility for LDI Benefits, on or about May 3, 2006, Greg Davis contacted Janice King on behalf of Dr. Christensen and substantiated that Dr. Christensen would receive LDI Benefits for his lifetime.

- At the time he purchased he Policy, Defendant informed him that he would be entitled to lifetime disability benefits and after he was disabled, repeatedly confirmed he would be entitled to such benefits – now, as he turns 65, Defendant has unreasonably and fraudulently changed its position and has informed Dr. Christensen that he is not entitled to lifetime benefits.

75. Defendant was aware that Dr. Christensen would rely upon the representations concerning LDI Benefits – between August 2002 and August 2003, Dr. Christensen conversed monthly with Ms. King concerning all aspects of his Policy and the award of benefits. Dr. Christensen specifically asked Ms. King to confirm his eligibility to receive lifetime benefits in relation to his plans to refinance his home and conduct financial planning for the remainder of his life. Dr. Christensen also informed Mr. Davis, who along with his administrative assistant, Ms. Capra, communicated with Defendant's representatives, why he needed confirmation of his LDI Benefits.

76.Dr. Christensen relied upon the Defendant's representations and made decisions he would not otherwise have made if Defendant had not stated in 2003 and thereafter that he would be eligible for LDI Benefits after age 65. For example, Dr. Christensen and his wife would have refinanced their mortgage in 2003 but instead would have sold their home and downsized. During the entire time period between August 2003 and the present, they would have saved more money and spent less in anticipation of the $5,000.00 per month benefit ceasing in November 2006.

77.Defendant breached and violated its legal duties and obligations to Dr. Christensen when it reversed its position and informed him he would not be eligible for LDI Benefits after age 65. The reckless nature of Defendant's representations are exemplified, in part, by Defendant's statements that the promises made to Dr. Christensen that he would receive LDI Benefits after age 65 were made in error.

78.As a direct proximate cause of Defendant's reckless representations, Dr. Christensen has suffered monetary damages, reasonably believed to be in excess of $75,000.00. These damages include, but are not limited to the loss of the $5,000.00 per month benefit that will cease, if the Defendant is allowed to maintain its position, after November 2006. Dr. Christensen also would have realized a profit on the sale of his home and

lower mortgage payments had he downsized instead of refinancing in 2003.

Additionally, he and his wife would have saved considerably more money

for their future if the misrepresentation had not occurred.

79.As a result of Defendant's fraudulent conduct, Dr. Christensen is

entitled to costs and fees associated with bringing this action, including

reasonable attorneys' fees.

## COUNT VII

## NEGLIGENT REPRESENTATION

80.Plaintiff realleges and incorporates by reference, all of the

allegations set forth in the proceeding paragraphs, as if fully set forth herein.

81.Because Defendant has a financial or pecuniary interest in the

administration of Dr. Christensen's disability insurance policy, Defendant

owed him a reasonable duty of care when communicating to him concerning

his eligibility to receive LDI Benefits after age 65.  Defendant also had a

duty to exercise an acceptable level of competence in obtaining benefit

information before communicating it to Dr. Christensen, especially where

Defendant knew that Dr. Christensen would rely upon the information and

did in fact rely on the information to make subsequent financial decisions.

82.Defendant breached its duty of reasonable care or competence in

obtaining or communicating the information concerning Dr. Christensen's

LDI Benefits after age 65 by its unreasonable conduct indicated above, including, but not limited to making the following representations and statements:

- In response to a phone call from Dr. Christensen where he inquired about his eligibility to receive LDI Benefits, Defendant's representative, Janice King stated in a letter dated August 11, 2003 and addressed to Dr. Christensen that his benefits under Policy No. 18-0D139393-001 would continue for his lifetime;
- On or about August 13, 2003, in response to a request From Dr. Christensen to confirm his eligibility for LDI Benefits, Jane Hunt, a financial customer services representative for Defendant stated to Mary Capra, an administrative assistant for Greg Davis, Dr. Christensen's insurance agent, that Defendant would provide LDI Benefits to Dr. Christensen for life – i.e., after age 65; and
- In response to another request by Dr. Christensen to confirm his eligibility for LDI Benefits, on or about May 3, 2006, Greg Davis contacted Janice King on behalf of Dr. Christensen and substantiated that Dr. Christensen would receive LDI Benefits for his lifetime.
- At the time he purchased he Policy, Defendant informed him that he would be entitled to lifetime disability benefits and after he was disabled, repeatedly confirmed he would be entitled to such benefits – now, as he turns 65, Defendant has unreasonably and fraudulently changed its position and has informed Dr. Christensen that he is not entitled to lifetime benefits.

83.Defendant was aware that Dr. Christensen would rely upon the representations concerning LDI Benefits – between August 2002 and August 2003, Dr. Christensen conversed monthly with Ms. King concerning all aspects of his Policy and the award of benefits. Dr. Christensen specifically

asked Ms. King to confirm his eligibility to receive lifetime benefits in relation to his plans to refinance his home and conduct financial planning for the remainder of his life.  Dr. Christensen also informed Mr. Davis why he needed confirmation of his LDI Benefits.

84.As a direct proximate cause of Defendants' negligent representations, Dr. Christensen has suffered monetary damages, reasonably believed to be in excess of $75,000.00. These damages include, but are not limited to the loss of the $5,000.00 per month benefit that will cease, if the Defendant is allowed to maintain its position, after November 2006.  Dr. Christensen also would have realized a profit on the sale of his home and lower mortgage payments had he downsized instead of refinancing in 2003. Additionally, he and his wife would have saved considerably more money for their future if the representation had not occurred.

85.As a result of Defendant's fraudulent conduct, Dr. Christensen is entitled to costs and fees associated with bringing this action, including reasonable attorneys' fees.

## COUNT VIII

## CLAIM FOR PUNITIVE DAMAGES

86.Plaintiff realleges and incorporates by reference, all of the allegations set forth in the proceeding paragraphs, as if fully set forth herein.

87.Pursuant to Minnesota Statute Sections 549.191 and 549.20, Dr. Christensen, at an appropriate time, will make a motion to amend these pleadings to add a claim for punitive damages.

88.The amount of punitive damages to which Dr. Christensen is entitled is not presently known, but will be determined at the trial on the merits, and is reasonable believed to be in excess of $50,000.00.

## JURY DEMAND

89.Dr. Christensen demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, on the account of the above-explained actions of the Defendant, Plaintiff prays for the following relief:

1. An award of damages in excess of $75,000.00.

2. An award of costs, including reasonable attorneys' fees.

3. An award of injunctive relief, enjoining Defendant from its refusal to pay Dr. Christensen LDI Benefits after age 65 and directing Defendant to pay Dr. Christensen $5,000.00 per month LDI Benefits.

4. A declaration from this Court indicating that Dr. Christensen is entitled to receive LDI Benefits after age 65.

5. Any other such further relief that the Court deems equitable and just under the circumstances.

**CHRISTENSEN, LAUE & RASMUS, P.A.**

Dated: October 26, 2006  By:     /s/ R. Daniel Rasmus
                                 R. Daniel Rasmus (#0260289)
                                 Gregory D. Luce (#239628)
                                 5101 Vernon Avenue South
                                 Suite 400
                                 Minneapolis, Minnesota 55436
                                 Telephone:  (952) 927-8855

**ATTORNEYS FOR PLAINTIFF**